**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,**<br>**v.**<br>**TREVOR LEE WHITE,**<br>**Defendant.** | **Case No. 26-CR-054-JFH** |

**OPINION AND ORDER**

Before the Court is the Report and Recommendation ("R&R") of Magistrate Judge Gerald L. Jackson [Dkt. No. 52], which recommends granting Defendant Trevor Lee White's ("Defendant") Motion to Suppress [Dkt. No. 43] in part. Defendant timely filed his Objections to the R&R [Dkt. No. 56], and the United States of America ("Government") responded. Dkt. No. 57. For the following reasons, Defendant's Objections are OVERRULED, and the Court ADOPTS the R&R. Thus, Defendant's Motion to Suppress is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Defendant is charged for possessing a firearm and ammunition as a felon on July 27, 2024, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(8). Dkt. No. 2. Defendant moves to suppress his statements that he made to three officers—Bradley Nelson, Jedidiah Griffith, and Jeremy Brooks—on July 27 based on their alleged violations of *Miranda v. Arizona*, 384 U.S. 436 (1966).

On July 27, 2024, Durant Police Department ("DPD") obtained a warrant to search a residence in Durant, Oklahoma, where officers believed evidence of stolen firearms would be present. Dkt. No. 53 at 7:13-8:4. Prior to the execution of that search warrant, at least eight officers attended a pre-operation briefing. *Id.*; *id.* at 59:8-11. In attendance were Brooks (a narcotics investigator with DPD and an ATF Task Force Officer), Nelson (a patrol officer with

DPD), and several others. It is unclear whether Griffith, who was also a patrol officer with DPD, attended. *Contrast id.* at 8:7-8 (Nelson stating that Griffith was at the briefing); *with id.* at 59:15-16 (Brooks stating that Griffith was not at the briefing). Brooks assisted in the briefing, and he was tasked with pre-execution surveillance of the residence. *Id.* at 47:14-20. Nelson was assigned scene security. *Id.* at 9: 1-5. Those in attendance were made aware that Defendant was a suspect in the investigation and was a convicted felon. *Id.* at 8:9-14; 46:23-47:3.

Shortly before executing the search, Brooks saw Defendant walking away from the residence while Brooks was surveilling the home. Brooks told Nelson of Defendant's movement and that he believed Defendant was possibly carrying a firearm. *Id.* at 9:12-20. Nelson then observed Defendant walking around the corner with a female. To Nelson, he appeared to be walking with an unnatural gait with his arm close to his body as if he was holding something. *Id.* at 9:23-10:1. Nelson momentarily lost sight of the pair. When the female reappeared, Defendant was not with her. So, Nelson began driving down the street looking for Defendant. *Id.* at 9:1-5. Nelson found Defendant walking down the street alone. Because he suspected Defendant of possessing a weapon as a felon, he handcuffed Defendant and patted him down. He did not find a firearm on Defendant. *Id.* at 9:5-10; Def.'s Ex. 1 at 0:55-2:10. Nelson put Defendant in Griffith's patrol car, and Griffith remained with Defendant while Nelson headed towards the residence. Dkt. No. 53 at 14:12-13.

Nelson maintained security outside the residence while the other officers breached and cleared the home. Def.'s Ex. 1 at 4:10-10:00. Once everyone in the house was detained, Nelson approached Brooks, who was standing outside the residence, and briefly conveyed how he had lost sight of the Defendant before arresting him. *Id.* at 11:03-11:27. Nelson informed him that Defendant did not have a firearm, so Brooks instructed him to use a K-9 unit to find the weapon.

*Id.* Nelson then linked up with a K-9 unit and began walking back towards the location of Defendant's arrest to search for the firearm. *Id.* at 11:30-16:15.

Once they arrived, Griffith pulled up to Nelson with Defendant still inside the patrol car. After Griffith got out, Nelson asked Griffith and the K-9 unit officer, "Do you want me to just *Mirandize* him?" *Id.* at 16:30-16:36. Immediately after, Nelson turned to Griffith and said, "I don't even have to do that on the weapon." *Id.* Nelson then opened the car door and asked Defendant where the firearm was, why Defendant "turned around" when he saw Nelson's car, the identity of the woman Defendant was walking with and where she was headed, and where Defendant had been staying. *Id.* at 16:37 to 18:45. Defendant told him multiple times that he did not have a gun, that he turned around because he was nervous the officers were looking for him, that he was headed to the store to get a drink, that he was walking with a female friend, and that he had been staying at the residence being searched. *Id.* Nelson left to search for the firearm, while Griffith remained with Defendant.

After Nelson returned to the patrol car with the missing firearm, Defendant can be seen standing outside the car telling Griffith, "I didn't have a gun, please, I'm telling you." *Id.* at 23:07. Griffith responded: "I'm going to put you in my car, and it ain't going to be pretty." *Id.* at 23:08. Defendant asked, "Can I at least have a cigarette sir?" *Id.* at 23:09-23:10. Griffith responded: "Well when you start telling the truth we'll start giving cigarettes . . . . this gentlemen right here [pointing to Nelson] has put a whole lot of time into this to listen to you lie to him." *Id.* at 23:10-23:20. Before shutting the door on Defendant, Griffith told Defendant that, "We're going to pull the [neighbor's] camera footage and we'll show it to you, showing you drop [the firearm], okay? And then we'll show it to a jury too." *Id.* at 23:32-23:40. Nelson left the pair to obtain the neighbor's camera footage, while Griffith remained with Defendant.

Approximately ten minutes later, Griffith approached Nelson while Nelson was talking to the neighbors. Griffith relayed that he had told Defendant he would "catch a charge once we get these cameras pulled." *Id.* at 32:05-32:12. Griffith said he then asked Defendant why he threw the gun away, to which Defendant replied, "Man because I'm a fucking felon." *Id.* at 32:12-32:18. Nelson asked Griffith whether anyone had *Mirandized* Defendant, and Griffith said no. *Id.*

Nelson later interacted with Brooks again when he asked about "talking to every single person" who was still detained outside the house. Def.'s Ex. 1 at 47:28. Nelson stated that he wanted to get them out of the heat, and Brooks told him to release anyone who did not have a warrant. *Id.* at 47:50-48:10. Neither discussed Defendant, nor was he present with that group.

Defendant was ultimately transported to the DPD police station, where Brooks began to interview him. After commenting on the heat, Brooks told Defendant that he was under arrest, and Defendant asks if there is anything he could do to change that and that he would be "one hundred percent honest." Def.'s Ex. 2. at 00:23-1:50. Brooks then provided a *Miranda* warning, and Defendant agreed to speak. *Id.* at 00:23-1:50. In response to Brooks's questioning, Defendant made several incriminating statements during the interview, including that he possessed the firearm. *Id.* at 3:00-4:34.

Defendant moved to suppress his statements to Nelson and Griffith because they failed to *Mirandize* him. Dkt. No 43 at 3-4. Additionally, even though Brooks *Mirandized* him, Defendant argued his statements to Brooks must be suppressed because the officers employed a deliberate, two-step interrogation tactic. *Id.* at 5-8. Specifically, he contended that Griffin and Nelson deliberately withheld *Miranda* warnings until they obtained a confession, and then Brooks provided a *Miranda* warning to obtain an identical, admissible confession. *Id.* Ultimately, the Magistrate Judge found that (1) some—but not all—of his statements to Nelson should be

suppressed; (2) his statement to Griffin that he was a felon should be suppressed; and (3) his statements to Brooks should not be suppressed. Defendant timely objected.

## STANDARD OF REVIEW

A district judge may refer a defendant's motion to suppress to a magistrate judge for findings and recommendation on resolving the motion. Fed. R. Crim. P. 59(b)(1). After the magistrate judge conducts a hearing and enters his or her recommendation, either party may file specific, written objections to the magistrate judge's recommendation within fourteen days. Fed. R. Crim. P. 59(b)(2). Failure to object waives a party's right to review. *Id.* If a party does file specific, written objections within fourteen days, then the district judge must review those objections de novo. Fed. R. Crim. P. 59(b)(3).

## ANALYSIS

The Self–Incrimination Clause of the Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Accordingly, the Supreme Court held *in Miranda v. Arizona* that, before custodial questioning, law enforcement must warn a suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. 436, 479 (1966). "Without these warnings, custodial confessions are presumed to be the product of coercion and are generally inadmissible for purposes of the prosecution's case in chief." *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021).

### A. Officer Nelson's Questioning During the Firearm Search

Both parties agree that Defendant was in custody for purposes of *Miranda* when Nelson interrogated Defendant about the location of the missing firearm. However, the Government

argued, and the Magistrate Judge agreed, that the "public safety exception" allowed Nelson to ask where the missing firearm was located. Dkt. No. 49 at 4-6; Dkt. No. 52 at 10-11. Stemming from *New York v. Quarles*, the public safety exception to *Miranda* recognizes that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." 467 U.S. 649, 657 (1984). The Tenth Circuit has recognized this exception for custodial statements made in response to questions that were necessary for public or officer safety. *See United States v. Lackey*, 334 F.3d 1224 (10th Cir. 2003).

Based on this public safety exception, the Magistrate Judge found that Defendant's statements to Nelson's about the missing firearm should not be suppressed. Dkt. No. 52 at 12. However, the Magistrate Judge found that Defendant's statements from Def.'s Ex. 1 at 17:28-18:26 and 18:36-18:47, which responded to questions about who Defendant had been walking with, where she was going, and where Defendant had been living, should be suppressed. *Id.* Although Defendant later argues that Nelson's questions evince an unconstitutional two-step interrogation warranting suppression of his statements *to Brooks*, Defendant does not object to the Magistrate Judge's application of the public safety exception. So, the Court ADOPTS this recommendation.[1]

**B. Officer Griffith's Questioning After the Firearm was Located**

Next, the Magistrate Judge recommended suppressing Defendant's custodial, incriminating statement to Griffith, where he admitted that he threw the firearm away because he was a felon. Dkt. No. 52 at 14. However, the Magistrate Judge found that this statement could be admitted for

[1] Defendant's statements to Nelson's questions about why Defendant "turned around" when he saw Nelson are also suppressed. *See* Def.'s Ex. 1 at 16:55-17:09.

impeachment or rebuttal purposes. *Id.* Neither party objects, so the Court ADOPTS this recommendation too.

**C. Officer Brooks's Interrogation at the Police Station**

Finally, Defendant moved to suppress Defendant's custodial, incriminating statements to Brooks after Brooks gave him a *Miranda* warning at the police station. The Magistrate Judge recommended that these statements should not be suppressed. Dkt. No. 52 at 17. Defendant objects to this recommendation. Dkt. No. 56. He argues that even though Brooks gave him a *Miranda* warning, this warning was part of a deliberate, two-step interrogation tactic where the previous officers deliberately withheld *Miranda* warnings until they obtained a confession, and then Brooks provided a *Miranda* warning to obtain an identical, admissible confession. *Id.* For the following reasons, the Court overrules this Objection.

In the Tenth Circuit, the admissibility of confessions given after these "midstream *Miranda*" warnings is governed by *United States v. Guillen*, 995 F.3d 1095 (10th Cir. 2021). There, the Tenth Circuit reviewed the Supreme Court's prior analyses of midstream *Miranda* warnings in *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004) and articulated the following test:

> First, was the initial self-incriminating statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further. If the initial statement was obtained in violation of the defendant's *Miranda* rights, has the government shown by a preponderance of the evidence that the questioning officer(s) did not engage in a deliberate two-step interrogation calculated to undermine *Miranda*? If so, the defendant's postwarning statement is admissible so long as it, too, was voluntary. If not, the postwarning statement is inadmissible unless the objective circumstances show that a reasonable person in the defendant's shoes would understand the import and effect of the midstream *Miranda* warnings.

*Guillen*, 995 F.3d at 1121 (internal citation omitted). Because *Miranda* requires suppression of several of Defendant's statements to Nelson and Griffith, the Court proceeds to step two.

Step two requires the Government to prove by a preponderance of the evidence that the officers did *not* deliberately employ a two-step interrogation tactic to evade *Miranda*. "[W]hether the interrogating officer made a conscious decision to withhold warnings as part of a deliberate strategy to circumvent *Miranda* will, of course, often turn on subjective evidence of the officer's intent. But deliberateness may also be inferred from objective indications of subjective intent to frustrate *Miranda*." *Guillen*, 995 F.3d at 1121

Several facts certainly do not favor the Government. Recall that, before interrogating Defendant about the firearm, Nelson asked Griffith and another officer, "Do you want me to just *Mirandize* him?" Def.'s Ex. 1 at 16:30-16:36. So, the other officers present—including Griffith—knew that Nelson had not *Mirandized* Defendant. Griffith also watched most of Nelson's interrogation of Defendant, and although he left Nelson's interrogation for a very brief period, Nelson gave no indication that he had *Mirandized* Defendant during that brief period. Even later, when Nelson asked Griffith if anyone *Mirandized* Defendant before Griffith interrogated Defendant about throwing away the firearm, Griffith said no one had. So, at no point during Nelson or Griffith's interrogations did Griffith have any reason to believe Defendant had been *Mirandized*. In fact, according to Griffith himself, he believed the opposite.

So, if Griffith knew the gun had been found, and if he believed no one *Mirandized* Defendant afterwards, then why did he still ask Defendant about throwing away the gun without a *Miranda* warning? The only explanation Griffith provided at the evidentiary hearing was that he "was unaware of the situation" and "[i]t was just small talk with Mr. White." Dkt. No. 53 at 42: 17-19. But, just a few minutes prior (after the gun had been found) Griffith also told Defendant he would give him a cigarette "when you start telling the truth," and that "[w]e're going to pull the [neighbor's] camera footage, and we'll show it to you, showing you drop [the firearm], okay? And

then we'll show it to a jury too." Def.'s Ex. 1 at 23:10-23:40. These statements seemed designed to induce Defendant into an admission and cast significant doubt that the two were just having "small talk" when Griffith later asked Defendant about why he threw away the firearm.

But, that does not mean that Griffith and the other officers deliberately intended to employ *a two-step interrogation tactic* where Brooks would later obtain the same confession after a *Miranda* warning. Indeed, Officer Brooks—who assisted with the pre-operation briefing that morning—testified that he never even spoke with Griffith that day. Dkt. No. 53 at 64: 14-15. Griffith confirmed that he was "[j]ust a patrolman" that day and was just "responding as needed." *Id.* at 39: 23; 40: 9. Griffith also testified that no one directed him to ask Defendant about the firearm or any "specific questions," he was unaware whether Defendant would be interviewed later, and he asked Defendant about the firearm on his "own volition." *Id.* at 42: 6-14; 43: 18-23. So, their testimony suggests that Griffith was not part of a plan for Griffith to withhold *Miranda* to obtain an incriminating statement and then have Brooks *Mirandize* Defendant to make that statement admissible.

Nor is there evidence suggesting Brooks and Nelson had such a plan. Nelson testified that no one directed him to ask Defendant any questions, that he was unaware of a plan to interview Defendant multiple times, and that he never heard "anyone talk about who was supposed to interview [Defendant]." Dkt. No. 53 at 18: 1-3; 16-18. Brooks also confirmed that, at the pre-operation briefing, he did not know who would interview Defendant either. *Id.* at 66: 22-24; 67: 4-13. Later, when Nelson told Brooks that he arrested Defendant and believed Defendant's firearm was missing, Brooks simply instructed Nelson to search for the firearm with a K-9 unit. Def.'s Ex. 1 at 11:04-11:30; Dkt. No. 53 at 64 at 16-25. He did not direct Nelson to ask any questions about the firearm.

So, it seems that Nelson interrogated Defendant on his own accord to find the firearm. And although some of Nelson's questions exceeded the public safety exception, he asked these questions during a stream of questions about the missing firearm. This suggests that his purpose in asking some of these improper questions—such as the name of the woman he saw with the Defendant—was to determine if *she* had the missing firearm.[2] So, Nelson's questions do not indicate a deliberate intent to employ a two-step interrogation tactic either.

Most importantly, Brooks testified that when he interrogated Defendant one hour later at the police station, he did not know whether any officer had *Mirandized* Defendant or questioned Defendant. Dkt. No. 53 at 54: 8-14; 56: 1-6. Nor did he "cross-examine" Defendant with his prior statements to Nelson and Griffith. So, there is no evidence that Brooks knew about Defendant's prior confessions or that there was a *Miranda* issue to rectify. And, multiple courts have refused to suppress evidence allegedly obtained from a deliberate, two-step interrogation where the latter confession was made to a different officer at a different time and location than the first confession, and the defendant was not cross-examined with his prior confession. *See e.g.*, *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007); *United States v. Zabokrtsky*, No. 19-CR-40089, 2020 WL 1082583, at *7 (D. Kan. Mar. 6, 2020); *United States v. Reynolds*, 526 F. Supp. 2d 1330, 1346 (N.D. Ga. 2007); *United States v. Khweis*, No. 16-CR-143, 2017 WL 2385355, at *14 (E.D. Va. June 1, 2017), *aff'd*, 971 F.3d 453 (4th Cir. 2020). Accordingly, the Court does not find that the officers deliberately employed a two-step interrogation tactic.

[2] Neither party objected to the Magistrate Judge's finding that several of Nelson's questions exceeded the public safety exception. So, the Court still suppresses Defendant's responses to those questions. The Court merely emphasizes that these improper questions do not evince a deliberate intent to employ a two-step interrogation tactic.

Because the Government has satisfied its burden on step two, the Court applies the general rule of *Elstad*—if Defendant's statements to Brooks were voluntary, Brooks's "administration of *Miranda* . . . should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314; *see also id.* at 311 (rejecting the notion that an initial, unwarned statement creates a "lingering compulsion" based on "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate"). The Magistrate Judge found that Defendant voluntarily waived his *Miranda* rights before confessing to Brooks. Dkt. No. 52. Defendant does not object to that finding, and the Court concurs with the Magistrate Judge. Thus, Defendant's statements to Brooks should not be suppressed.

**CONCLUSION**

IT IS THEREFORE ORDERED that the Magistrate Judge's R&R [Dkt. No. 52] is ADOPTED, and Defendant's Objections [Dkt. No. 56] are OVERRULED. Consequently, Defendant's Motion to Suppress [Dkt. No. 43] is GRANTED IN PART and DENIED IN PART.

Dated this 9th day of November, 2026.

JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE